O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| KELLY REED and FADI OSMANO, | ) Case No. EDCV 13-0142 JGB<br>) (OPx)<br>) |
| Plaintiffs, | ) **ORDER GRANTING**<br>) **DEFENDANT'S MOTION FOR** |
| v. | ) **SUMMARY JUDGMENT; DENYING**<br>) **AS MOOT DEFENDANTS'** |
| NBTY, INC.; MET-RX NUTRITION, INC.; UNITED STATES NUTRITION, INC., | ) **MOTION TO DENY**<br>) **CERTIFICATION; DENYING AS**<br>) **MOOT PLAINTIFFS' MOTION** |
| Defendants. | ) **FOR CLASS CERTIFICATION**<br>)<br>) |

Before the Court are Defendants' Motion for Summary Judgment, Defendants' Motion to Deny Class Certification, and Plaintiffs' cross-motion for Class Certification.  (Doc. Nos. 59, 59, 73.)  After considering the papers timely filed and the arguments presented at the June 9, 2014 hearing, the Court GRANTS

1  Defendants' motion for summary judgment and DENIES AS

2  MOOT the cross motions regarding class certification.

3

4                    **I.   BACKGROUND**

5

6      Plaintiffs Kelly Reed ("Reed") and Fadi Osmano

7  ("Osmano") filed their Complaint on January 24, 2013

8  against Defendants NBTY, Inc., Met-Rx Nutrition, Inc.,

9  and United States Nutrition, Inc. (collectively,

10  "Defendants"). (Compl., Doc. No. 1.)  On April 8,

11  2013, Plaintiffs filed the operative First Amended

12  Complaint ("FAC") stating five claims for relief for:

13  (1) violation of the Unfair Competitions Law ("UCL")

14  under Cal. Bus. & Prof. Code § 17200; (2) violation of

15  the False Advertising Law ("FAL") under Cal. Bus. &

16  Prof. Code § 17500; (3) violation of the California

17  Legal Remedies Act ("CLRA") under Cal. Civ. Code §

18  1750; (4) breach of express warranty; and (5) unjust

19  enrichment. (Doc. No. 11.)  Defendants answered on

20  April 29, 2013. (Doc. No. 13.)

21      The FAC states a class action on behalf of

22  individuals who purchased the products Met-Rx NitroPump

23  NOS ("NitroPump"), Body Fortress Super NOS Pump ("NOS

24  Pump"), or Body Fortress Super Advanced NOS Blast,

25  which are manufactured, marketed, sold, and distributed

26  by Defendants. (FAC ¶ 1.)  The Court GRANTS the

27  parties' stipulation dismissing all allegations and

28  claims regarding Body Fortress Super Advanced NOS

1  Blast.  (Doc. No. 43.)[1]  Plaintiffs allege that
2  Defendants made numerous false and misleading claims on
3  the labels and proprietary and third-party websites
4  advertising the Products.  (FAC ¶ 9.)  Generally, the
5  FAC contends that the products falsely claim to: (1)
6  improve nitric oxide levels, (2) increase vasodilation
7  and blood flow, and (3) increase lean muscle mass.
8  (Id. ¶¶ 47-74.)

9      The parties filed three substantive motions.  On
10  March 26, 2014, Defendants filed a motion for an order
11  denying class certification.  (Doc. No. 47.)  On March
12  31, 2014, Defendants filed a motion for summary
13  judgment.  (Doc. No. 64.)  On Aril 7, 2014, Plaintiffs
14  filed a class certification motion.  (Doc. No. 73.)

15      While the motions were pending, Plaintiffs filed
16  several ex parte applications and procedural motions.
17  The Court denied Plaintiffs' ex parte application to
18  strike the motion denying certification (Doc. No. 70)
19  and Plaintiffs' motion to exceed the page limitation in
20  opposition to summary judgment (Doc. No. 79).  The
21  Court continued the hearings on Defendants' motions for
22  summary judgment and to deny certification to be heard
23  with Plaintiffs' cross-certification motion and
24  permitted Plaintiffs to file a joint motion and
25  opposition addressing certification in excess of the
26  page limits.  (Doc. Nos. 70, 88.)  The Court held a

27

28      _____

[1] As necessary, NOS Pump and NitroPump will be
referred to collectively as "the Products."

hearing on the three motions on June 9, 2014.  Because the Court grants Defendants' motion for summary judgment herein, it does not reach the parties' cross motions for class certification.[2]

Defendants move for summary judgment on all of Plaintiffs' causes of action.  ("Mot.," Doc. No. 59.) In support of their Motion, Defendants filed the following documents:

- Memorandum of Points and Authorities (Mot.);
- Statement of Undisputed Facts ("SUF," Doc. No. 60);
- Declaration of Susan H. Mitmesser ("Mitmesser Decl.," Doc. No. 61) attaching Exhibit A;[3]

---

[2] "Under the proper circumstances—where it is more practicable to do so and where the parties will not suffer significant prejudice—the district court has discretion to rule on a motion for summary judgment before it decides the certification issue." Wright v. Schock, 742 F.2d 541, 543-44 (9th Cir. 1984).  The parties do not raise any prejudice resulting from the Court deciding the motion for summary judgment prior to ruling on certification.  In this case, the Court finds it is proper to address summary judgment prior to certification because "resolution of a motion for summary judgment seems likely to protect both the parties and the court from needless and costly further litigation." Id. at 544.  Moreover, given that the parties waited over a year to brief the certification issue, this is not a case which "cries out for a ruling on certification as rapidly as possible." Wade v. Kirkland, 118 F.3d 667, 670 (9th Cir. 1997).  For the sake of judicial economy, the Court takes up summary judgment first.  See Sarviss v. Gen. Dynamics Info. Tech., Inc., 663 F. Supp. 2d 883, 890 n.1 (C.D. Cal. 2009).

[3] Defendants applied to seal Exhibit A to the Mitmesser Declaration.  (Doc. No. 64.)  Exhibit A is Defendants' "Structure Function File" which includes information regarding their substantiation for the active ingredient in the Products.  (Mitmesser Decl ¶ 5.)  In their application, Defendants admit that the

4

1    • Declaration of David Lefer ("Lefer Decl.," Doc.

2      No. 62), attaching Exhibits B through E;[4] and

3    • Declaration of William A. Delgado ("Delgado

4      Decl.," Doc. No. 63), attaching Exhibits F

5      through Q.

6      The Court struck Plaintiffs' initial April 7, 2014

7    opposition (Doc. Nos. 75, 79), and Plaintiffs refiled

8    _____

9    majority of the studies and articles in Exhibit A are
     "publicly available." (Doc. No. 64 at 2.) However,
     they claim sealing is required because "the
10   identification of which specific studies Defendants has
     [sic] collected and retained for purposes of [their]
11   structure function file took time and effort and is
     confidential." (Id.)

12       A party must present "compelling reasons" to seal
     judicial records attached to a dispositive motion.
13   Kamakana v. City & Cnty. of Honolulu, 447 F.3d 1172,
     1178-79 (9th Cir. 2006); Oliner v. Kontrabecki, __ F.3d
14   __, 2014 WL 1088254, at *1 (9th Cir. 2014) ("In keeping
     with the strong public policy favoring access to court
15   records, most judicial records may be sealed only if
     the court finds 'compelling reasons.'"). Defendants
16   incorrectly rely on the good cause standard to justify
     sealing, and do not provide the Court with any
17   compelling reasons justifying secrecy. Defendants do
     not pinpoint "articulable facts identifying the
18   interests favoring continued secrecy . . . and show
     that these specific interests overcome the presumption
19   of access by outweighing the public interest in
     understanding the judicial process." Kamakana, 447
20   F.3d at 1181 (citation and quotation omitted). The
     vague contention that competitors could rely on these
21   publicly available documents to support and launch a
     competing product is insufficient. Without more,
22   Defendants have not met their "heavy burden" of
     demonstrating that their mere compilation of academic
23   studies overcomes the Court's "strong presumption of
     openness." Oliner, 2014 WL 1088254, at *2 (quotation
24   omitted). The Court therefore DENIES Defendants'
     application to seal Exhibit A. (Doc. No. 64.)
25   Defendants shall publicly file Exhibit A on the docket
     within 10 days of this Order.
26       [4] Due to the volume of evidence filed in support
     of, in opposition to, and in reply to the Motion, the
27   Court does not enumerate each attached Exhibit, but
     describes the documents in subsequent evidentiary
28   citations as needed.

5

an opposition in conformity with the page limits on April 11, 2014.  ("Opp'n," Doc. No. 80.)[5]  Plaintiffs attached their Statement of Genuine Disputes of Material Facts ("SGI," Doc. No. 76) and a Declaration of Nick Suciu, III ("Suciu Decl.," Doc. No. 77) appending Exhibit A through K.[6]

_____

[5] The publicly accessible version of Plaintiffs' opposition includes several redactions.  (Doc. No. 80.)  In chambers, the Court received an unredacted version of the opposition, which was not filed on the docket.  In violation of the Local Rules, Plaintiffs did not apply to seal their unredacted opposition, nor did they manually file a copy with the Clerk.  Local Rule 79-5.1 states that

> "no case or document shall be filed under seal or in camera without prior approval by the Court.  Where approval is required, a written application and a proposed order shall be presented to the judge along with the document submitted for filing under seal or in camera. . . .  Applications and proposed orders to seal or file in camera, along with the material to be sealed or submitted in camera, shall not be electronically filed but shall be presented to the Clerk for filing in paper format . . . ."

L.R. 79-5.1.  Plaintiffs did not attempt to comply with the rules for filing documents under seal.  The Court therefore does not consider the chambers copy of the unredacted opposition.  This Order is based only on the opposition Plaintiffs publicly filed as Document Number 80.

[6] Once again, the docketed versions of the SGI and Suciu declaration are redacted.  Several portions of the SGI are blackened out and Exhibits A and B attached to the Suciu declaration are omitted.  With regard to Plaintiffs' summary judgment filings, Plaintiffs did not file an application to seal these documents, nor did they manually file the documents with the Clerk, as required by Local Rule 79-5.1.  Instead, Plaintiffs improperly filed chambers copies of Exhibits A and B.  The Court has never received an unredacted version of the SGI in any form.  Nonetheless, as to Exhibits A and B to the Suciu Declaration, the Court located sealed

On April 14, 2014, Defendants replied to the Motion.  ("Reply," Doc. No. 81.)  Defendants also filed the following documents in support of their Reply:

- Evidentiary Objections to the Suciu Declaration ("Evid. Obj.," Doc. No. 82);

- Reply Declaration of Susan H. Mitmesser ("Mitmesser Reply Decl.," Doc. No. 83); and

- Reply Declaration of William A. Delgado ("Delgado Reply Decl.," Doc. No. 84) attaching Exhibits R and S.

_____

versions of these exhibits manually filed by Plaintiffs under seal attached to another declaration filed in support of their class certification motion.  (See Declaration of Jonathan Shub in Support of Class Certification, Exhs. C, D, Doc. Nos. 72, 73.)  Even though these documents were not properly filed in opposition to summary judgment, the Court considers Plaintiffs' applications to seal these exhibits here. Plaintiffs do not provide any "compelling reasons" to seal these documents and instead improperly rely on the protective order issued in this case.  Kamakana, 447 F.3d 1178.  "[T]he presumption of access is not rebutted where . . . documents subject to a protective order are filed under seal as attachments to a dispositive motion.  The . . . 'compelling reasons' standard continues to apply."  Foltz v. State Farm Mut. Auto. Ins. Co., 331 F.3d 1122, 1136 (9th Cir. 2003) (internal citations omitted).  Since Plaintiffs did not meet the standard required for sealing documents filed as part of a summary judgment motion, the Court DENIES Plaintiffs' applications to file Exhibits C and D to the Declaration of Jonathan Shub ("Shub Decl.," Doc. Nos. 73-6 to 73-11) under seal.  Plaintiffs shall publicly file unredacted versions of these documents on the docket within 10 days of this Order.  In this Order, the Court considers the redacted version of the SGI (Doc. No. 76) and the unredacted versions of Exhibits A and B to the Suciu declaration, which were ineffectively filed under seal as Exhibits C and D to the Shub Declaration filed in support of Plaintiffs' motion for class certification.

## II. LEGAL STANDARD[7]

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material when it affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).

The party moving for summary judgment bears the initial burden of establishing an absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. This burden may be satisfied by either (1) presenting evidence to negate an essential element of the non-moving party's case; or (2) showing that the non-moving party has failed to sufficiently establish an essential element to the non-moving party's case. Id. at 322-23. Where the party moving for summary judgment does not bear the burden of proof at trial, it may show that no genuine issue of material fact exists by demonstrating that "there is an absence of evidence to support the non-moving party's case." Id. at 325.

---

[7] Unless otherwise noted, all references to "Rule" refer to the Federal Rules of Civil Procedure.

8

However, where the moving party bears the burden of proof at trial, the moving party must present compelling evidence in order to obtain summary judgment in its favor. United States v. One Residential Property at 8110 E. Mohave, 229 F. Supp. 2d 1046, 1047 (S.D. Cal. 2002) (citing Torres Vargas v. Santiago Cummings, 149 F.3d 29, 35 (1st Cir. 1998) ("The party who has the burden of proof on a dispositive issue cannot attain summary judgment unless the evidence that he provides on that issue is conclusive.")). Failure to meet this burden results in denial of the motion and the Court need not consider the non-moving party's evidence. One Residential Property at 8110 E. Mohave, 229 F. Supp. 2d at 1048.

Once the moving party meets the requirements of Rule 56, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. The non-moving party does not meet this burden by showing "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250. When ruling on a summary judgment motion, the Court must examine all the evidence in the light most favorable to the non-moving party. Celotex, 477 U.S.

at 325.   The Court cannot engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the jury.  Anderson, 477 U.S. at 255.

## III. FACTS

### A. Evidentiary Objections

Defendants filed evidentiary objections to four of the exhibits filed in support of Plaintiffs' opposition.  (Evid. Obj.)  On hearsay grounds, Defendants object to Exhibits H and I to the Suciu declaration, which are two reports of Plaintiffs' expert, Dr. William Campbell ("Campbell").  (Suciu Decl., Exhs. H, I.)  Plaintiffs' counsel attaches both reports to his own declaration, but he is not competent to testify about the matters therein.  Fed. R. Civ. P. 56(c)(4); see Harris v. Extendicare Homes, Inc., 829 F. Supp. 2d 1023, 1027 (W.D. Wash. 2011) (striking two expert reports attached to counsel's declaration as hearsay).  Furthermore, the reports are unsworn, and courts in this circuit have routinely held that unsworn expert reports are inadmissible.  See Aecon Bldgs., Inc. v. Zurich N. Am., 572 F. Supp. 2d 1227, 1237 (W.D. Wash. 2008); Shuffle Master, Inc. v. MP Games LLC, 553 F. Supp. 2d 1202, 1210-11 (D. Nev. 2008); Ridgel v. United States, No. SACV 12-0071 JGB MLG, 2013 WL

2237884, at *2 (C.D. Cal. May 21, 2013); <u>King Tuna,</u>
<u>Inc. v. Anova Food, Inc.</u>, No. 07-7451-ODW, 2009 WL
650732, at *1 (C.D. Cal. Mar. 10, 2009) (stating that
"[i]t is well-settled that under Fed. R. Civ. P. 56(e),
unsworn expert reports are not admissible to support or
oppose summary judgment" and that "to be competent
summary judgment evidence, an expert report must be
sworn to or otherwise verified, usually by a deposition
or affidavit").

In addition, Plaintiffs fail to attach or otherwise
provide the documents on which Campbell relied in
drafting his reports.  <u>See</u> Fed. R. Civ. P. 56(c);
<u>Harris</u>, 829 F. Supp. 2d at 1027 ("The [expert] reports
are also inadmissible because they fail to attach
copies of the documents to which they refer . . . . The
Court will not simply assume that the experts have
accurately quoted or characterized those documents.").
In his reports, Campbell cites to numerous studies
purporting to investigate the effects of oral arginine
supplementation.  (<u>See</u> Suciu Decl., Exh. H at 2-3, Exh.
I at 2-10.)  Plaintiffs did not attach these studies to
the reports or authenticate them as exhibits.

The Court therefore finds Campbell's reports
inadmissible, SUSTAINS Defendants' objections to
Exhibits H and I to the Suciu Declaration, and does not
consider them here.

Defendants also object to two studies attached to
the Suciu Declaration as Exhibits J and K.  Defendants

provide no support or grounds for their hearsay objections, therefore the Court OVERRULES Defendants' objections to Exhibits J and K.

**B. Disputed and Undisputed Facts**

Except as noted, the following material facts are sufficiently supported by admissible evidence and are uncontroverted.  They are "admitted to exist without controversy" for purposes of the Motion.  L.R. 56-3 (facts not "controverted by declaration or other written evidence" are assumed to exist without controversy); Fed. R. Civ. P. 56(e)(2) (stating that where a party fails to address another party's assertion of fact properly, the court may "consider the fact undisputed for purposes of the motion").  Any facts the Court finds disputed are clearly marked as such.  The Court does not rely on any fact or evidence beyond that stated below.

Defendants manufacture and market the products NOS Pump and NitroPump, each of which provides 3,000 mg of Arginine-Alpha-Ketoglutarate Dehydrate ("AAKG") and contain 1,950 mg of the active ingredient L-Arginine per serving.  (SUF 1-3; SGI 1-3.)  Plaintiffs claim that Defendants falsely advertise that the Products provide the following benefits: (1) improved nitric oxide levels, (2) increased vasodilation and blood flow, and (3) increased lean muscle mass.  (SUF ¶ 4;

SGI ¶ 4; FAC ¶¶ 47-74.)  Specifically, Plaintiffs contend the following statements in Defendants' advertising are false or misleading:

(a) "NitroPump NOS;"

(b) "Nitric Oxide Inducer & Stimulator;"

(c) "Contains Arginine, an amino acid that can serve as a precursor for the formation of Nitric Oxide;"

(d) "Nitric Oxide Boosters have dominated the Sports Supplement Industry-and for good reason;"

(e) "Supports Vascular Function;"

(f) "Supports Blood Flow and Nutrient Delivery;"

(g) "Ultimate Vaso-Flow Booster;"

(h) "Supports Blood Flow and Nutrient Delivery;"

(i) "[AAKG] is an amino acid compound that helps maintain normal, healthy blood flow and nutrient delivery to cells;"

(j) "This supplement is important for circulation of glucose and other nutrients during exercise;"

(k) "MET-Rx NitroPump NOS is a vaso-flow booster that's hardcore and laboratory tested;"

(l) "Superior NOS Pump;" and

(m) "Support Increased Lean Muscle Tissue."
(FAC ¶¶ 47-48, 58-59, 67.)  Plaintiffs allege these false, deceptive, and misleading statements can be found on the Products' labels, Defendants' websites,

and on the website www.bodybuilding.com.  (Id. ¶¶ 8-10.)

Plaintiff Fadi Osmano ("Osmano") purchased NOS Pump one time on November 30, 2012 from the third-party website www.bodybuilding.com.  (SUF ¶ 5; SGI ¶ 5.) Osmano did not review the label of NOS Pump before his purchase.  (Deposition of Fadi Osmano ("Osmano Depo.") 29:4-30:25, Delgado Decl., Exh. F.)  Osmano also did not review Defendants' websites before his purchase. (Id. 31:1-6.)  The only advertising Osmano saw prior to his purchase of NOS Pump was on bodybuilding.com.  (Id. 73:7-15.)

At the time of Osmano's purchase, the NOS Pump webpage on bodybuilding.com included the following statements: "Nitric Oxide Stimulator;" "Ultimate Vaso-Flow Booster; "Nitric Oxide is critical for enhancing blood flow and nutrient delivery to muscles and other active cells during exercise;" "Increased blood flow can serve to deliver nutrients to all cells of the body, including muscles;" and "This can be crucial during high intensity exercise, when blood flow and circulation are especially important."  (FAC, Exh. F.) Interpreting the claims on the bodybuilding.com page, Osmano purchased NOS Pump believing that "it can grow your muscles."  (Osmano Depo. 31:16-32:4; SUF ¶ 6; SGI ¶ 6.)  Osmano's sole reason for purchasing NOS Pump was for "muscle growth."  (Osmano Depo. 62:6-10.)

After he received the product in the mail, he used it approximately one to five times.  (Id. 40:23-41:5.) He discontinued using NOS Pump because he did not notice any difference in his body or workouts.  (Id. 63:7-17.)

Plaintiff Kelly Reed ("Reed") purchased NitroPump once on December 2, 2013 from the website www.bodybuilding.com.  (SUF ¶ 15; SGI ¶ 15.)  Reed never saw any advertising for the product other than the statements made on bodybuilding.com.  (SUF ¶ 17; SGI ¶ 17.)  She does not recall reviewing the product's label or Defendants' websites prior to her NitroPump purchase.  (Deposition of Kelly Reed ("Reed Depo.") 37:6-38:3, 56:13-25, Delgado Decl., Exh. H.)  Reed never used the product.  (SUF ¶ 21; SGI ¶ 21.)

At the time of her purchase, the bodybuilding.com page for NitroPump included the following statements: "Support Increased Lean Muscle Tissue;" "vaso-flow booster;" "It contains Arginine, an amino acid that can serve as a precursor for the formation of nitric oxide;" and "Nitric Oxide is thought to help support muscles and the circulation of oxygen and other critical elements."  (FAC, Exh. C.)  After reviewing the webpage, Reed purchased NitroPump based on "the potential for improved circulation [and] improved lean muscle mass."  (Reed Depo. 32:19-23.)[8]

_____

[8] Reed also mentioned that she purchased NitroPump because it had limited or no side effects.  (Reed Depo.

1    Bodybuilding.com is an online retail customer of

2    Defendants.  (Deposition of Patrick Cornacchiulo

3    ("Cornacchiulo Depo.") 68:22-24, Shub Decl., Exh. C.)

4    It "is not owned or controlled by any of the Defendants

5    and is not a parent subsidiary, sister, or affiliate"

6    of Defendants.  (Declaration of Patrick Cornacchiulo

7    ("Cornacchiulo Decl.") ¶ 3, Doc. No. 49.)

8    Bodybuilding.com contains webpages which serve as a

9    point of sale for NOS Pump and NitroPump and includes

10   marketing information regarding the Products.  (FAC,

11   Exhs. C, F.)  The bodybuilding.com page for NitroPump

12   includes the claim that it will "Support Increased Lean

13   Muscle Tissue."  (SUF ¶ 24; SGI ¶ 24.)  This claim does

14   not appear on the labels or Defendants' websites for

15   NitroPump or NOS Pump.  (SUF ¶¶ 25-26; FAC, Exhs. A, B,

16   D, E.)  Defendants did not provide this claim regarding

17   increased lean muscle tissue to bodybuilding.com.

18   (Cornacchiulo Decl. ¶¶ 6, 7.)

19        There "potentially" is a vendor agreement between

20   Defendants and bodybuilding.com, although it was not

21   provided to the Court.[9]  (Cornacchiulo Depo. 69:4-11.)

22   Defendants "can provide bodybuilding.com with content

23   and/or images to place on the bodybuilding.com

24   website," but "it does not universally do so for all of

25   

26   32:19-23.)  Plaintiffs do not make any claims regarding
     NitroPump's side effects, therefore this basis for
27   Reed's purchase is not at issue in this litigation.
     [9] "Q: Are you aware of any signed vendor agreement
28   with bodybuilding.com? A: I'm not aware, no."
     (Cornacchiulo Depo. 85:17-19.)

Defendants' products sold on bodybuilding.com."
(Cornacchiulo Decl. ¶ 5.)  There is no evidence that
Defendants provided the advertising language at issue
in this case to bodybuilding.com.  (Cornacchiulo Depo.
70:2-16; 77:7-78:17.)  According to the undisputed
deposition testimony, Defendants began providing
marketing materials to bodybuilding.com "recently," not
necessarily during the time frame when the challenged
statements appeared.  (Id. 83:3-84:2.)

At most, there is evidence that Defendants
sometimes control the content within a "square" on the
Products' purchase pages on bodybuilding.com, where
Defendants may place an ad.  (Id. 70:23-71-25.)[10]
However, there is no evidence that the statements
challenged by Plaintiffs appeared in that square or
that Defendants provided the content during the time
period at issue in this action.  In fact, on the
bodybuilding.com webpages Plaintiffs supplied to the
Court, none of the challenged statements appear within
the square.  (FAC, Exhs. B, E.)  Further, there is
undisputed evidence that bodybuilding.com has exclusive
control over areas of the NitroPump and NOS Pump

_____

[10] There is uncontradicted evidence that
bodybuilding.com places its own language and content in
the square when Defendants do not provide content.
(Cornacchiulo Depo. 71:20-25.)  There is no evidence
indicating that Defendants controlled the square during
the time period when the challenged statements
appeared.

product pages which include the challenged statements[11] and that bodybuilding.com necessarily writes its own marketing for Defendants' products.  (Cornacchiulo Decl. ¶ 7; Cornacchiulo Depo. 74:6-10.)  Defendants would prefer that bodybuilding.com use language from the labels of NOS Pump or NitroPump, but "[t]here's no set rule" requiring it do so.  (Cornacchiulo Depo. 49:6-15, 74:6-21.)

There is no policy or procedure requiring that Defendants review bodybuilding.com's pages featuring the Products.  (Id. 75:1-14.)  Defendants "try to monitor" the online retailers to ensure they are using Defendants' labeling claims in the marketing, "but it's [the online retailers'] job of purchasing and mak[ing] sure they're not doing anything wrong with the product."  (Id. 49:16-50:2.)  There is no evidence that Defendants ever reviewed the bodybuilding.com webpages for NOS Pump or NitroPump when the challenged statements appeared.  (Id.)

To support their advertising claims, Defendants rely on studies within their "Structure Function File" created for AAKG which contains 121 documents. (Mitmesser Decl., Exh. A; SUF ¶ 32.)  Of these 121

---

[11] Bodybuilding.com has exclusive control over the portion of the NitroPump product page which includes the claim that it "support[s] increased lean muscle tissue!"  (Cornacchiulo Decl. ¶ 7, Exh. T.) Bodybuilding.com also has exclusive control over the portion of the NOS Pump product page which includes the claims "Nitric Oxide Stimulator!" and "Ultimate Vaso-Flow Booster!"  (Id. ¶ 7, Exh. U.)

documents, Plaintiffs admit that eleven of them reported at least some improvement on at least one of the Product claims resulting from AAKG.  (SUF ¶ 34; SGI ¶ 34.)  Plaintiffs nonetheless claim that these eleven studies had limitations which render them unsupportable of Defendants' claims.  (SGI ¶ 34.)[12]

## IV.  DISCUSSION

Defendants move for summary judgment on all five causes of action.  The Court finds that Plaintiffs' claims fail for multiple reasons and addresses many of Defendants' arguments for dismissal below.  In Parts A and B, the Court addresses whether the named Plaintiffs are entitled to bring their claims against these Defendants.  In Parts C through E, the Court addresses the merits of Plaintiffs' claims.

**A. Standing**

"In a class action, standing is satisfied if at least one named plaintiff meets the requirements."  See Bates v. United Parcel Serv., 511 F.3d 974, 985 (9th Cir. 2007); Stearns v. Ticketmaster Corp., 655 F.3d 1013, 1021 (9th Cir. 2011).  The action must be

---

[12] In the excluded expert reports, Plaintiffs also claim to possess studies which challenge the conclusions regarding AAKG's effectiveness presented in Defendants' studies.  (See Delgado Decl., Exhs. J, K.)

19

dismissed if none of the named plaintiffs have standing to assert their individual claims.  See In re Tobacco II Cases, 46 Cal. 4th 298, 319 (2009).

In addition to Article III standing, the named plaintiffs must establish standing to bring the UCL, CLRA, and FAL claims.  See Cal. Bus. & Prof. Code §§ 17204, 17535; Cal. Civ. Code § 1780(a).  In order to have standing under the UCL, FAL, or CLRA, the named plaintiff must demonstrate actual reliance.  See Kwikset Corp. v. Superior Court, 51 Cal. 4th 310, 326 (2011); Cohen v. DIRECTV, Inc., 178 Cal. App. 4th 966, 973 (2009).  As such, Plaintiffs must actually rely on the allegedly false or misleading statements prior to purchasing the product.  Id.; see also Durell v. Sharp Healthcare, 183 Cal. App. 4th 1350, 1363 (2010) (holding that there was no reliance where "SAC [did] not allege [plaintiff] ever visited [defendant's] Web site").  The purpose of this requirement is "to confine standing to those actually injured by a defendant's business practices and to curtail the prior practice of filing suits on behalf of 'clients who have not used the defendant's product or service, viewed the defendant's advertising, or had any other business dealing with the defendant. . . .'"  Clayworth v. Pfizer, Inc., 49 Cal. 4th 758, 788 (2010) (citations omitted).

To survive summary judgment, Plaintiffs are required to set forth "specific facts" in support of

standing.  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S.
555, 561 (1992).  "In this context, this means that
Plaintiffs must point to specific facts indicating that
Plaintiffs actually saw the misrepresentations about
which they complain, and that those misrepresentations
were 'substantial factor[s]' in Plaintiffs' decisions
to purchase [the Products]."  <u>In re iPhone Application
Litig.</u>, 6 F. Supp. 3d 1004, 1020 (N.D. Cal. 2013).

It is undisputed that neither Reed nor Osmano
viewed the labels of NitroPump or NOS Pump or visited
Defendants' websites prior to purchasing the Products.
Accordingly, the named plaintiffs do not have standing
to pursue claims on the basis of representations made
on the labels or on Defendants' websites.

In <u>In re Ferrero Litigation</u>, plaintiffs alleged
that Ferrero's Nutella website contained various
misrepresentations, but in the complaint plaintiffs
alleged that they only relied on representations from
Nutella's label and television advertisements in
purchasing Nutella.  <u>In re Ferrero Litig.</u>, 794 F. Supp.
2d 1107, 1112 (S.D. Cal. 2011).  The court found that
based on these allegations, "[p]laintiffs did not
actually rely on the statements on Nutella's website
before making their purchases and lack standing to
challenge these statements under the UCL, FAL, and
CLRA."  <u>Id.</u>  Just as in <u>Ferrero</u>, Plaintiffs state
claims on the basis of misrepresentations made on the
Products' labels and Defendants' websites, even though

neither of the named plaintiffs saw the labels or websites prior to purchasing.  (FAC ¶¶ 8-10, 25.) Therefore, Plaintiffs did not actually rely on any statements from the Products' labels or Defendants' websites in making their decision to buy NitroPump or NOS Pump.  See Bruton v. Gerber Products Co., 961 F. Supp. 2d 1062, 1091 (N.D. Cal. 2013) ("[T]he Court therefore finds that Bruton does not have standing to assert claims based on advertisements and websites that she did not view personally.").

Plaintiffs argue that they have standing to assert claims based on the representations on Defendants' websites and labels because they are substantially similar to the statements Plaintiffs viewed on the third-party website bodybuilding.com.  (Opp'n at 11.) Plaintiffs cite no law to support this proposition.  In fact, Plaintiffs do not point to a single case in their argument regarding standing.  (See Opp'n at 10-11.)

Some courts hold that a plaintiff may have standing to assert claims over products she did not purchase "so long as the products and alleged misrepresentations are substantially similar."  Miller v. Ghirardelli Chocolate Co., 912 F. Supp. 2d 861, 869 (N.D. Cal. 2012) (citing cases).  These cases are inapplicable to the instant scenario.  The cases permit a plaintiff, who viewed and relied on representations on one of defendant's products, to have standing to assert claims on behalf of unnamed class members who purchased

similar products marketed and manufactured by defendant
which included substantially similar claims. See Brown
v. Hain Celestial Group, Inc., 913 F. Supp. 2d 881, 890
(N.D. Cal. 2012). Unlike in those cases, here, the
named Plaintiffs did not view Defendants' products, and
they are not seeking to assert claims for unnamed class
members who purchased other similar products with
similar claims. Crucially, Reed and Osmano never
viewed Defendants' products or websites, and thus did
not rely on any representations thereon. Instead, they
relied on the advertising and marketing materials
produced by a third-party website. Accordingly,
Plaintiffs do not have standing to assert claims based
on representations they did not actually view, even if
similar representations appeared on Defendants'
products or websites. See O'Connor v. Uber
Technologies, Inc., __ F. Supp. 2d __, 2014 WL 4382880,
at *9 (N.D. Cal. 2014) ("[T]hird-party reliance is
insufficient to establish standing . . . ."); Granfield
v. NVIDIA Corp., No. 11-5403, 2012 WL 2847575, at *6
(N.D. Cal. July 11, 2012); Carrea v. Dreyer's Grand Ice
Cream, Inc., No. 10-1044, 2011 WL 159380, at *3 (N.D.
Cal. Jan. 10, 2011) (same), aff'd on other grounds, 475
F. Appx. 113 (9th Cir. 2012).

In Brazil v. Dole Food Co., Inc., No. 12-CV-01831-
LHK, 2013 WL 5312418 (N.D. Cal. Sept. 23, 2013), the
court found that the named plaintiff did not have
standing to assert claims based on the label or website

because he did not view or rely on these marketing materials prior to his purchase.  Id. at *2.  The court reasoned that "were [it] to hold that Brazil, who never viewed the Health Claims, has standing to bring claims based solely upon allegations that he would not have purchased a product that was misbranded, purchasers who never 'viewed the defendant's advertising' or misleading labeling would have standing to sue."  Id.; see also Ivie v. Kraft Foods Global, Inc., 961 F. Supp. 2d 1033, 1047 (N.D. Cal. 2013) ("[A]llegations of 'similar' packaging or labels [are] insufficient to meet the standing requirement.").[13]

In In re iPhone Application Litigation, the court rejected the plaintiffs argument that "standing is established as long as a plaintiff 'receives' a misrepresentation."  In re iPhone Application Litig., 6 F. Supp. 3d at 1022.  The court held that to survive summary judgment, the plaintiffs must do more than show that defendant disseminated the alleged misrepresentation in some fashion.  Id.  Rather, the plaintiffs must produce evidence that the named

---

[13] **Error! Main Document Only.** "Where [] a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements."  In re Tobacco II Cases, 46 Cal.4th at 328.  Unlike in In re Tobacco II, here, Plaintiffs do not allege or provide evidence to support that they were exposed to a long-term advertising campaign.  As such, Plaintiffs must provide evidence showing that they actually relied on the statements on the websites and labels prior to purchasing NitroPump and NOS Pump.

plaintiffs "actually sees, reads, or hears the
defendant's statement." Id.  Here, Plaintiffs have
failed to produce evidence that Reed or Osmano actually
saw, read, or heard Defendants' statements as printed
on the Products' label or Defendants' websites.
Because Plaintiffs did not view the representations as
printed on the websites or labels, they do not have
standing to state based on misrepresentations printed
thereon.

In a class action under the UCL, FAL, and CLRA, it
is critical that the named plaintiffs actually view and
rely on representations directly produced and
disseminated by Defendants.  Permitting named
plaintiffs to state claims on behalf of representations
printed on products or websites they never viewed opens
the door to a class of consumers with a highly
attenuated connection to the misrepresentations at the
center of the litigation.  Moreover, third-party
websites may include numerous statements, claims, and
pictures not approved or endorsed by Defendants.  Even
if selected representations on third-party websites are
copied verbatim from Defendants' marketing materials,
they may be included within and among other statements
and claims solely created by a third party.  Where
third-party claims are mixed with Defendants' claims,
Plaintiffs bear the burden of pointing to specific
facts demonstrating that Defendants' alleged
misrepresentations were a "substantial factor" in

1  Plaintiffs' decisions to purchase NitroPump and NOS

2  Pump.  <u>In re Tobacco II Cases</u>, 46 Cal. 4th 298, 326

3  (2009).

4       It is beyond dispute that a key representation at

5  issue in this action, namely "Support Increased Lean

6  Muscle Tissue," appears only on bodybuilding.com.

7  (<u>Compare</u> FAC, Exh. C <u>with</u> FAC, Exhs. A, B, D, E; SUF ¶¶

8  25-26.)  This claim is central to Plaintiffs' case

9  because both Plaintiffs purchased the Products in

10  reliance on their belief that the Products would

11  improve muscle growth or increase muscle mass.[14]

12  Neither this claim nor any similar language appears on

13  the Products' labels or on Defendants' websites.

14       Specifically, Reed purchased NitroPump relying at

15  least in part on the claim "Support Increased Lean

16  Muscle Tissue" that she viewed on the bodybuilding.com

17  webpage.  (Reed Depo. 47:7-11.)  No similar claim

18  appears on the NitroPump label or website.  In fact,

19  neither the NitroPump website nor the label includes

20  the word "muscle."  Thus, Reed relied on a claim that

21  is not substantially similar to any representation made

22  by Defendants.

23       Although Reed also relied on statements from

24  bodybuilding.com which are similar (and in some cases

25  identical) to those on the NitroPump label and website,

26  _____

27  [14] <u>See</u> Reporter's Transcript of Proceedings June 9,
   2014 ("June 9 RT") 7:11-14, Doc. No. 97 ("THE COURT:
   Isn't there evidence that the primary motivation by

28  either of the plaintiff of this case was basically to
   increase muscle mass? MR. GEORGE: Yes, Your Honor.").

this partial similarity is insufficient to survive summary judgment.  A showing of actual reliance requires a plaintiff to establish that "the defendant's misrepresentation or nondisclosure was an immediate cause of the plaintiff's injury-producing conduct."  In re Tobacco II Cases, 46 Cal. 4th at 326 (internal quotation marks omitted).  While a plaintiff need not demonstrate that the defendant's misrepresentations were "the sole or even the predominant or decisive factor influencing his conduct," the misrepresentations must have "played a substantial part" in the plaintiff's decisionmaking.  Id. (internal quotation marks omitted).  Plaintiffs produce no evidence to show that Defendants' representations, as opposed to those added by bodybuilding.com, played a substantial part in Reed's decision to purchase NitroPump.  Without evidence that Defendants' representations were an immediate cause of Reed's purchase, the Court cannot find that Reed has standing to sue under the UCL, FAL, or CLRA.  See Ogden v. Bumble Bee Foods, LLC, No. 5:12-CV-01828-LHK, 2014 WL 27527, at *11 (N.D. Cal. Jan. 2, 2014).  Given the centrality of the muscle growth claim to Plaintiffs' case and its prominent position on the non-party website viewed by Reed, the omission of the any muscle-related claim from Defendants' marketing and labelling of NitroPump is fatal to Reed's standing to pursue claims regarding this product.

As to NOS Pump, the claims on the bodybuilding.com page viewed by Osmano are substantially similar to those on Defendants' website and the product label. As discussed above, the Court declines to find that a plaintiff like Osmano has standing to sue on behalf of misrepresentations made on a product and website he did not view, even where the representations are substantially similar to those he viewed on a third-party website. Nonetheless, as discussed *infra* in Section IV.C.3, Plaintiffs' claims based on Osmano's beliefs concerning the representations on NOS Pump fail to provide any basis for substantive relief under the UCL, FAL, or CLRA. Thus, even if he has standing to state a claim, his claims regarding NOS Pump fail on the merits.

In sum, the Court holds that Plaintiffs have not raised a triable issue of fact concerning whether Plaintiffs actually relied on misrepresentations on Defendants' labels and websites. The Court thus concludes that no Plaintiff has standing to sue based on claims on the NitroPump or NOS Pump websites and labels. See Pfizer Inc. v. Superior Court, 182 Cal. App. 4th 622, 633 (2010); Wright v. Gen. Motors Acceptance Corp., 545 F. App'x 686, 688 (9th Cir. 2013) (affirming summary judgment where the named plaintiff failed to establish standing to bring suit under the UCL). Accordingly, the Court dismisses the UCL, FAL, and CLRA claims in the FAC which are based on

Defendants' websites and the NOS Pump and NitroPump labels.

## B. Vicarious Liability

All of the claims Plaintiffs actually viewed were on the product pages for NOS Pump and NitroPump on bodybuilding.com—a third-party website.  Defendants argue they did not provide the challenged statements to bodybuilding.com and thus they cannot be liable for their alleged falsity.  (Mot. at 10-11.)

It is well established that the "concept of vicarious liability has no application to actions brought under the unfair business practices act." Emery v. Visa Int'l Serv. Ass'n, 95 Cal. App. 4th 952, 960 (2002) (quoting People v. Toomey, 157 Cal. App. 3d 1, 15 (1984)).  Rather, "[a] defendant's liability [under the UCL] must be based on [its] personal 'participation in the unlawful practices' and 'unbridled control' over the practices." Id. (quoting Toomey, 157 Cal. App. 3d at 15); see also In re Jamster Mktg. Litig., No. MDL 1751, 2009 WL 1456632, at *8 (S.D. Cal. May 22, 2009) (same); In re Firearm Cases, 126 Cal. App. 4th 959, 985 (2005) (rejecting UCL claim where defendants "did not control the wrongful acts [in question] or encourage others to engage in questionable acts," even though defendants did "have a relationship with the wrongdoers").  Likewise, for an FAL claim,

"mere knowledge of the falsity of a third-party's statements is insufficient to support direct liability . . . ." Yordy v. Plimus, Inc., No. 12-CV-00229-TEH, 2014 WL 1466608, at *3 (N.D. Cal. Apr. 15, 2014). Similarly, under the CLRA, a defendant's liability must be based upon "participation or control in the alleged unlawful advertising scheme." In re Jamster, 2009 WL 1456632, at *9.

Plaintiffs have not produced any evidence from which a reasonable jury could conclude that Defendants personally participated in and had unbridled control over the representations made on bodybuilding.com. Plaintiffs point only to the similarity of the claims on Defendants' marketing and bodybuilding.com to argue that Defendants should be liable for the representations. However, this is insufficient to raise a triable issue of fact on Defendants' personal involvement and unbridled control over bodybuilding.com's actions. Cf. Dorfman v. Nutramax Labs., Inc., No. 13CV0873 WQH RBB, 2013 WL 5353043, at *14 (S.D. Cal. Sept. 23, 2013) (finding plaintiffs adequately alleged that retailers of the product could be subject to liability under the UCL and CLRA for misrepresentations made on the packaging where the complaint stated the retailers (1) "market and sell the Cosamin products at issue, and participated in the dissemination of the representations concerning the efficacy of the Cosamin products and adopted the

representations as their own;" (2) "entered into
marketing and sales agreements with Nutramax to further
promote and repeat the false and deceptive statements
at issue,;" and (3) "provid[e] pictures of the false
and deceptive packaging and labeling for the Cosamin
products").

There is no evidence that Defendants controlled the
language on the third-party site when the challenged
statements appeared.  Plaintiffs did not present a
vendor agreement between Defendants and
bodybuilding.com, nor is there evidence that Defendants
reviewed or monitored the representations made on the
product pages.  There is zero evidence that Defendants'
supplied bodybuilding.com with the statements it used
on its website during the time period at issue here.
The only portion of the webpages which Defendants
controlled did not include the challenged
representations.  The evidence reveals that
bodybuilding.com had substantial discretion as to the
claims made on its website, could write its own content
without Defendants' oversight, and had exclusive
control over some of the areas which contained the
challenged statements.  In fact, there is undisputed
evidence that Defendants did not supply bodybuiding.com
with one of the key claims at issue in this litigation
regarding increasing lean muscle tissue.  Thus,
bodybuilding.com must have independently inserted this
claim without the Defendants' authority.  Without any

evidence of Defendants' direct participation in or control over bodybuilding.com's marketing claims, Plaintiffs have not presented a triable issue of fact and Defendants cannot be liable for the statements made on a third-party website.

Plaintiffs insist that even though the "language is not directly supplied to bodybuilding.com," bodybuilding.com would generate marketing language based on the Products' labels. (Opp'n at 10.) "But ostensible authority must be based on the acts or declarations of the principal and not solely upon the agent's conduct." Emery, 95 Cal. App. 4th at 961 (citation omitted). Plaintiffs do not point to any acts by Defendants which authorized bodybuilding.com to use the claims. The fact that bodybuilding.com chose to use some language from Defendants' labels does not demonstrate that Defendants personally participated in or controlled the content on bodybuilding.com's pages. Moreover, even if Defendants knew of the falsity of the statements made on bodybuilding.com, their knowledge is insufficient to support liability under the UCL, FAL, or CLRA. See Yordy, 2014 WL 1466608, at *3; In re Jamster, 2009 WL 1456632, at *8 ("[T]hat T-Mobile knew of complaints concerning deceptive marketing [was] insufficient to show that [it] controlled, participated, approved, marketed or otherwise adopted [Jamster's] advertising practices."). Actual participation, not just knowledge, is required.

This case is strikingly similar to Herron v. Best Buy Co. Inc., 924 F. Supp. 2d 1161 (E.D. Cal. 2013), where the Court refused to hold Toshiba, a manufacturer, responsible for the battery life representations Best Buy, a retail store, made on the product tag for a Toshiba laptop. Id. at 169. The court found there was no evidence that Toshiba exercised control over the preparation or distribution of Best Buy's battery life representation, and "'[t]he worst that can be said is that [Toshiba] did not take more aggressive corrective steps' to police Best Buy's representations concerning the Laptop's battery test results." Id. The court dismissed Plaintiff's UCL claims on this basis. Id. Defendants similarly cannot be held liable under the consumer protection statutes for misrepresentations made by a third-party retailer without evidence that Defendants controlled the preparation or distribution of these statements. See also Perfect 10, Inc. v. Visa Int'l Serv. Ass'n, 494 F.3d 788, 808-09 (9th Cir. 2007) (holding that although Visa processed payments for websites that infringed copyrights, "[b]ecause 'Visa itself played no part in preparing or sending any 'statement' that might be construed as untrue or misleading under the unfair business practices statutes,' it could not be liable for unfair competition.").

For these reasons, Defendants cannot be liable for the statements made on bodybuilding.com, which are the

only remaining representations at issue in this litigation and the only ones viewed by the named Plaintiffs.

## C. Absence of a Triable Issue of Fact

Assuming Plaintiffs could present evidence of the named Plaintiffs' standing or Defendants' control over the representations on bodybuilding.com, Plaintiffs' claims would nonetheless fail because they have not presented a triable issue of fact on at least one substantive element of each cause of action.

All five of Plaintiffs' claims are based on the contention that the marketing statements listed above are false, misleading, and deceptive. (FAC ¶¶ 28, 47-48, 58-59, 67, 74.) Plaintiffs allege that Defendants' claims are based on a faulty causal chain which purports to show that AAKG, the active ingredient in the Products, will induce an increase in circulating nitric oxide levels, which will cause vasodilation or increased blood flow, thereby increasing muscle oxygenation and nutrient delivery during exercise, resulting in recovery and growth of the muscles. (Opp'n at 6-7.) Plaintiffs argue that this premise is contrary to scientific evidence. (Id. at 14.) Plaintiffs rely on scientific studies which purport to show that healthy individuals who orally consume AAKG at the dosage recommended on the Products will not

increase nitric oxide levels, improve blood flow, or increase muscle strength or mass.  (<u>Id.</u> at 14-19.)

Claims under the UCL, FAL, and CLRA are governed by the "reasonable consumer" test, which requires plaintiffs to prove that "members of the public are likely to be deceived." <u>Williams v. Gerber Prods. Co.</u>, 552 F.3d 934, 938 (9th Cir. 2008).  Although reasonableness can, in appropriate circumstances, be decided as a question of law, "California courts . . . have recognized that whether a business practice is deceptive will usually be a question of fact not appropriate for decision on [a motion for summary judgment]." <u>Id.</u> (internal citation omitted).  The UCL, FAL, and CLRA prohibit advertising which is false, and also advertising which, although true, is either misleading or which has a capacity, likelihood or tendency to deceive or confuse the public. <u>Id.</u>  In a false advertising case under the UCL, FAL, or CLRA, the plaintiff "bears the burden of proving that the defendant's advertising claim is false or misleading." <u>Nat'l Council Against Health Fraud, Inc. v. King Bio Pharm., Inc.</u>, 107 Cal. App. 4th 1336, 1342 (2003).

**1. Evidence of Falsity**

1    Plaintiffs have not met their burden of providing

2  evidence that Defendants' advertising claims are false

3  or misleading.  As discussed above, Plaintiffs'

4  purported expert reports are unsworn and therefore

5  cannot be considered by the Court.  Moreover, the

6  expert reports merely summarize several scientific

7  studies.  (Suciu Decl., Exhs. H, I.)  However,

8  Plaintiffs do not provide the Court with copies of the

9  studies which purport to demonstrate the falsity of

10 Defendants' claims.  "Written documents relied upon by

11 the affiants must be actually exhibited."  See Ditton

12 v. BNSF Ry. Co., No. CV 12-6932 JGB JCGX, 2013 WL

13 2241766, at *5 (C.D. Cal. May 21, 2013).  "The Court

14 will not simply assume that the experts have accurately

15 quoted or characterized those documents."  Harris v.

16 Extendicare Homes, Inc., 829 F. Supp. 2d 1023, 1027

17 (W.D. Wash. 2011).  Without the expert reports or the

18 studies relied on therein, Plaintiffs have not

19 presented any evidence of falsity.

20    Aside from the inadmissible evidence, Plaintiffs

21 append one study to their opposition, but it does not

22 demonstrate any evidence of falsity of the claims on

23 Defendants' Products.[15]  ("Wax Study," Suciu Decl.,

24 Exhs. J.)  The Wax Study addressed AAKG's effect on

25 maximal strength and muscle endurance and tested half

26

27 ───────────────
      [15] Plaintiffs also attach another study (Suciu
28 Decl., Exh. K), but they do not purport to rely on this
   study to demonstrate the false or misleading nature of
   Defendants' claims.  (See SGI ¶ 25.)

of the dosage suggested on the Products.  (Compare Wax
Study at 2 (stating that study participants ingested
3,000 mg of AAKG) with Cornacchiulo Decl., Exhs. V, X
(directions on NitroPump and NOS Pump labels state that
users should take 6 tablets equaling 6,000 mg each time
they exercise).)  As discussed more fully below,
Defendants do not make any claims regarding muscle
strength or growth; therefore, the results of this
study are irrelevant.  Moreover, the fact that AAKG
supplementation has no ergogenic benefit at half the
recommended dose on Defendants' Products has no
tendency to prove that the Products do not work as
advertised.  As Plaintiffs repeatedly point out,
scientific studies which test the active ingredient at
doses divergent from those recommended by Defendants do
not substantiate Defendants' claims.  (See Opp'n at 14,
15, 19, 23-24 ("dosing . . . need[s] to be used to
filter out relevant studies").)  For both these
reasons, no reasonable jury could rely on the Wax Study
to find that the claims regarding NOS Pump or NitroPump
are false or misleading.

     Accordingly, Plaintiffs have not met their burden
of demonstrating a necessary element of all of their
claims.  Since Plaintiffs have not presented any
evidence that Defendants' advertising claims on NOS
Pump and NitroPump are false or misleading, they have
not raised a triable issue of fact as to whether the
public is likely to be deceived.  See Fraker v. Bayer

*Corp.*, No. CVF08-1564 AWI GSA, 2009 WL 5865687, at*8
(E.D. Cal. Oct. 6, 2009) ("To successfully allege a
claim for false advertising, Plaintiff has the burden
to plead and prove facts that show that the claims that
Defendant made in connection with product are false or
misleading.").

### 2. Lack of substantiation

Alternatively, Defendants argue that Plaintiffs'
claims must be dismissed because they are based on an
improper lack of substantiation theory.  (Mot. at 14-
17.)

Private litigants cannot bring claims under the
UCL, CLRA, or FAL based on a lack of substantiation.
See King Bio Pharm., 107 Cal. App. 4th at 1345
("Private plaintiffs are not authorized to demand
substantiation for advertising claims."); Bronson v.
Johnson & Johnson, Inc., No. 12-04184, 2013 WL 1629191,
at *8 (N.D. Cal. Apr. 16, 2013); Stanley v. Bayer
Healthcare LLC, No. 11cv862-IEG(BLM), 2012 WL 1132920,
at *3 (S.D. Cal. Apr. 3, 2012).  Only prosecuting
authorities, not private plaintiffs, have the
administrative power to request advertisers to
substantiate advertising claims.  King Bio Pharm.,
Inc., 107 Cal. App. 4th at 1344.  Private plaintiffs
may not "shift[s] the burden of production to

defendants" to prove that studies exist which substantiate their claims.  Id. at 1345.

Plaintiffs argue that they are not making a lack of substantiation claim, but instead contend that Defendants' statements are contradicted by scientific evidence.  (Opp'n at 19-20.)  Courts are careful to distinguish between allegations that advertising claims are actually false as opposed to allegations that such claims lack substantiation.  Fraker, 2009 WL 5865687, at *8-9.

Even considering Plaintiffs' inadmissible expert reports, it is clear that Plaintiffs' claims are premised on a lack of substantiation theory.  In his expert reports, Plaintiffs' expert, William Campbell ("Campbell"), presents several studies which he contends demonstrate that AAKG does not offer any of the benefits claimed by Defendants for their products. ("Campbell Report," Delgado Decl., Exh. J.)  In the same reports, Campbell acknowledges that there are multiple studies which indicate "at least some improvement of one of the [Product] label claims resulting from . . . an [AAKG] supplement."  ("Campbell Reply Report" at 6, Delgado Decl., Exh. K.)  Campbell challenges the results of studies reporting benefits from AAKG on the grounds that they: used higher doses of the product, used "diseased populations," included different ingredients, or had "methodological/research design flaws."  (Id. at 6-7.)  However, many of these

1   quarrels with the studies amount to a contention that

2   Defendants cannot substantiate their claims of

3   effectiveness.[16]

4        For example, Campbell admits that AAKG can increase

5   vascular function "in a diseased population,

6   particularly somebody with cardiovascular disease."

7   ("Campbell Depo." 120:19-24, Delgado Decl., Exh. M.)

8   Defendants' advertising claims are not limited to

9   healthy persons.  Thus, at the very least, Defendants'

10  claims regarding vascular flow cannot be false or

11  misleading for "diseased" purchasers.  Plaintiffs

12  provide no evidence or explanation for why studies on

13  diseased populations cannot be extrapolated to support

14  Defendants' claims.  See Scheuerman v. Nestle

15  Healthcare Nutrition, Inc., No. CIV. 10-3684 FSH PS,

16  2012 WL 2916827, at *8 (D.N.J. July 17, 2012) (applying

17  the UCL, FAL, and CLRA and stating "[t]he fact that

18

19        [16] As to dosage and different ingredients, the Court
20  agrees that studies which test different combinations
    of ingredients or significantly disparate quantities
21  from the accused products may not be probative of the
    products' effectiveness.  See Eckler v. Wal-Mart
22  Stores, Inc., No. 12-CV-727-LAB-MDD, 2012 WL 5382218
    (S.D. Cal. Nov. 1, 2012).  At this stage in the
23  litigation, Plaintiffs are required to produce relevant
    and probative studies demonstrating falsity, while
24  Defendants are not required to produce any
    substantiation for the Products' effectiveness.  See
25  King Bio Pharm., 107 Cal. App. 4th at 1345 ("We reject
    NCAHF's request to change current California law to
26  shift the burden of production of evidence to
    defendants in false advertising actions.").  Thus,
27  while the Wax Study must test similar ingredients and
    quantity of AAKG as that present in the Products,
28  Defendants are not under any obligation to produce such
    studies.

Nestle relies upon studies that demonstrate LRP or similar probiotics' effectiveness in specific age groups does not render any of Nestle's advertising claims—which never indicated a specific age range . . . false or misleading.").  Even assuming such extrapolation is improper, at most Plaintiffs' argument amounts to a contention that Defendants lack substantiation for their claims as they relate to healthy individuals.[17]

Moreover, any purported design or methodological flaws in Defendants' studies are insufficient to demonstrate the claims are false or misleading.  "[T]he strength of [Defendants'] evidence is irrelevant and Plaintiffs' claims are based on 'lack of substantiation' rather than proof of falsity." Johns v. Bayer Corp., No. 09CV1935 AJB DHB, 2013 WL 1498965, at *47 (S.D. Cal. Apr. 10, 2013).  Plaintiffs essentially argue that Defendants' representations were not based on "credible evidence" and thus lack proper scientific support.  Id. at *46.  But to satisfy its burden, Plaintiffs must do more than criticize studies demonstrating the efficacy of Defendants' products.

_____

[17] In their motion for class certification, Plaintiffs seek to certify a class of "all persons in the State of California who purchased the products." (Doc. No. 73 at 17.)  Such a definition necessarily includes "diseased" persons for whom the Products' claims were admittedly true.  Thus, the class is overbroad.  See Mazur v. eBay, Inc., 247 F.R.D. 562, 567 (N.D. Cal. 2009) (rejecting a class definition as imprecise and overbroad where it included person who were not harmed).

See <u>Stanley</u>, 2012 WL 1132920, at *4; <u>Scheuerman</u>, 2012 WL 2916827, at *8 (granting summary judgment where "Nestle has produced over forty scientific articles and studies that it contends provide the required substantiation for its 'clinically shown' advertising claims. [footnote and citations omitted] While Plaintiffs' experts take issue with the strength and significance of these studies, their criticisms do not satisfy Plaintiffs' burden of demonstrating that the 'clinically shown' advertising claims are false or misleading."). The parties present countless reasons to discount or limit the findings in the opposing parties' studies. (<u>See</u> Opp'n at 21-23; Lefer Decl. ¶¶ 17-18; Campbell Reply Report at 5-7.) Disputes over the quality and credibility of the substantiation for the claims on Defendants' products are not properly brought before the Court in a suit by private plaintiffs. <u>See</u> <u>Johns</u>, 2013 WL 1498965, at *46 ("[E]ven though Plaintiffs raise potential concerns as to the 'substantiation' for Bayer's representations, and whether such representations were based on 'credible evidence,' litigating such an action is not within the providence of private plaintiffs under the UCL and CLRA."). Attacking the credibility of Defendants' studies improperly shifts the burden of substantiation to Defendants.

To the extent that Plaintiffs' inadmissible studies went beyond attacking Defendants' studies and actually

presented conflicting scientific conclusions, such studies are still insufficient.  As the caselaw makes clear a plaintiff's reliance on "inconclusive, rather than contradictory evidence" is insufficient to support a claim that products are false or misleading.  Bronson v. Johnson & Johnson, Inc., No. C 12-04184 CRB, 2013 WL 5731817, at *4 (N.D. Cal. Oct. 22, 2013).  Plaintiffs acknowledge that there are studies supporting the effectiveness of AAKG and others purportedly finding no benefits.  Inconclusive findings and unsettled science are insufficient to meet Plaintiffs burden of raising a question of fact on the issue  of falsity.  See Route v. Mead Johnson Nutrition Co., No. CV 12-7350-GW JEMX, 2013 WL 658251, at *4 (C.D. Cal. Feb. 21, 2013) ("[C]it[ing] studies both indicating that there are genuine health benefits to prebiotics, and, studies reaching the contrary conclusion" "does not in any fashion indicate that the representations on the Products' labels are false[.]").  The UCL, FAL, and CLRA do not requiring unanimous scientific consensus for each advertising claim on Defendants' products.  Defendants need only avoid statements which would be false or misleading to a reasonable consumer.  The Court cannot require more, as to do so amounts to imposing a substantiation requirement.

Defendants present the Court with 121 documents, including 10 animal studies, 1 monograph, 34 non double-blinded placebo controlled studies, and 41

double-blind placebo controlled studies, which demonstrate the claimed-benefits and effectiveness of AAKG.  (Mitmesser Decl., Exh. A.)  Plaintiffs purport to possess twelve studies which contradict the findings in Defendants' science.  (Campbell Report at 10.)  However, it is undisputed that two of the studies cited by Campbell support the challenged claims made on the Products.  (SUF ¶¶ 37, 38; SGI ¶¶ 37, 38.)  Moreover, Plaintiffs admit that at least eleven of the studies supplied by Defendants support their claims, although they allegedly suffer from credibility issues.  (Campbell Reply Report at 6-7.)  This mixed evidence demonstrates at most that the science on AAKG's effectiveness is inconclusive.  This evidence does not satisfy Plaintiffs' burden of raising a triable issue as to whether the claims on NOS Pump and NitroPump are false or misleading.  Where there are studies demonstrating both the effectiveness and ineffectiveness of the Products, a reasonable jury could not find that the advertising claims are false.  Plaintiffs' lack of substantiation claims must therefore fail.

### 3. Plaintiffs' Experiences with the Products

Plaintiffs argue that aside from the scientific evidence discussed above, they can prove falsity by relying on Osmano's testimony that the product did not work for him – the only named Plaintiff who took the product. (Opp'n at 16.) Osmano took NOS Pump one to five times, and he determined that the product did not work because he did not believe he was growing muscles, getting stronger, lifting more, or feeling more energy. (Osmano Depo. 63:7-19.)

However, the advertising claims do not promise increased strength, greater weight lifting ability, or increased energy. Rather, Plaintiffs fault Defendants' advertising for falsely promising to (1) improve nitric oxide levels, (2) increase vasodilation and blood flow, and (3) increased lean muscle mass. (SUF ¶ 4; SGI ¶ 4; FAC ¶¶ 47-74.) Osmano does not have any evidence to show that his nitric oxide level, blood flow, or lean muscle mass was unimproved after taking NOS Pump. Plaintiffs cannot rely on Osmano's testimony to provide evidence of falsity because they "failed to produce any evidence that the product does not work for the purposes for which it is advertised." See Stanley, 2012 WL 1132920, at *8.

Insofar as Osmano testified that NOS Pump failed to "support increased lean muscle tissue" or, more generally, muscle growth, these claims fail for multiple reasons. First, Osmano did not see this claim before purchasing and thus he does not have standing to

1  raise it.  See Pfizer, 182 Cal. App. 4th at 632.  The

2  claim, "Support Increased Lean Muscle Tissue," appeared

3  only on the NitroPump page on bodybuilding.com.  (SUF

4  ¶¶ 24-26.)  Osmano did not purchase NitroPump, nor does

5  he recall viewing the NitroPump page prior to

6  purchasing NOS Pump.  (Osmano Depo. 38:23-29:1.)

7  Second, this claim appeared only on bodybuilding.com

8  and was not on any of the Products' labels or

9  Defendants' websites.  (SUF ¶¶ 24-26.)  There is

10  undisputed evidence that Defendants did not provide the

11  statement "support increased lean muscle tissue" to

12  bodybuilding.com.  (SUF ¶ 27.)  As discussed above,

13  Defendants cannot be liable for advertising it did not

14  produce or control.

15      Finally, Plaintiffs argue that a claim regarding

16  muscle growth can be extrapolated from the other claims

17  on the labels and websites.  (Opp'n at 18-19.)

18  Specifically, Plaintiffs point to the statements on the

19  Products which profess to provide a "rapid supply of

20  amino acids and carbohydrates for recovery" and

21  "nutrient delivery to muscles."  (Osmano Depo. 31:22-

22  32:4; Opp'n at 19.)[18]  To connect these claims to

23

24  _____

[18] Osmano viewed the following claims on the
bodybuilding.com page for NOS Pump: "Nitric Oxide
25  Stimulator;" "Ultimate Vaso-Flow Booster; "Nitric Oxide
is critical for enhancing blood flow and nutrient
26  delivery to muscles and other active cells during
exercise;" "Increased blood flow can serve to deliver
27  nutrients to all cells of the body, including muscles;"
and "This can be crucial during high intensity
28  exercise, when blood flow and circulation are
especially important."  (FAC, Exh. F.)

"muscle growth" or "increased lean muscle mass,"
Plaintiffs rely on a scientific study which purports to
show that "delivery of amino acids and nutrients to the
muscles during recovery has anabolic effect on protein
metabolism after weight training and endurance
exercises, i.e. muscle growth." (See SGI ¶ 26; Suciu
Decl., Exh. K.)

The Court must determine whether the claims on
Defendants' labels and websites (or the substantially
similar claims on bodybuilding.com) could lead a
reasonable consumer to conclude that the products would
cause muscle growth. See Yumul v. Smart Balance, Inc.,
733 F. Supp. 2d 1117, 1129 (C.D. Cal. 2010). Even if
the study cited by Plaintiffs connects the Products'
claims to muscle growth, the Court cannot rely on a
study in a scientific journal which most purchasers
have not read to determine what a reasonable consumer
would believe when reading Defendants' claims. See
Cardenas v. NBTY, Inc., 870 F. Supp. 2d 984, 994 (E.D.
Cal. 2012) ("A 'reasonable consumer' is 'the ordinary
consumer acting reasonably under the circumstances,'
and 'is not versed in the art of inspecting and judging
a product, in the process of its preparation or
manufacture.'") (citation omitted). The Court finds
that Osmano's belief that NOS Pump promised muscle
growth reached beyond what a reasonable consumer could
justifiably conclude from the language presented. See
Carrea v. Dreyer's Grand Ice Cream, Inc., No. C 10-

1  01044 JSW, 2011 WL 159380, at *5 (N.D. Cal. Jan. 10,

2  2011), aff'd, 475 F. App'x 113 (9th Cir. 2012) (finding

3  that no reasonable consumer who read the statements

4  "original" and "classic" on a food product could

5  conclude that they were more wholesome and healthy than

6  other frozen desserts).  There is a substantial

7  analytical gap between a claim which promises to

8  deliver nutrients to muscles and a belief that the

9  product will cause muscle growth.  NitroPump and NOS

10 Pump indicate they are designed to support the

11 formation of nitric oxide, blood flow, and nutrient

12 delivery.  Nowhere does Defendants' marketing claim or

13 imply that the Products can be used to increase the

14 size or strength of one's muscles.  Osmano's

15 interpretation is "predicated on a strained and

16 unjustified interpretation" of the label and website

17 statements.  Herron, 924 F. Supp. 2d at 1173 (internal

18 quotation omitted).  Liability for false or misleading

19 advertising under the UCL, FAL and CLRA "cannot be

20 based upon the fact that [the product] did not work for

21 [Osmano] in the way []he believed (but that Defendant

22 did not represent) it would." Stanley, 2012 WL

23 1132920, at *9; Lavie v. Procter & Gamble Co., 105 Cal.

24 App. 4th 496, 508 (2003) ("'Likely to deceive' implies

25 more than a mere possibility that the advertisement

26 might conceivably be misunderstood by some few

27 consumers viewing it in an unreasonable manner.

28 Rather, the phrase indicates that the ad is such that

1   it is probable that a significant portion of the

2   general consuming public or of targeted consumers,

3   acting reasonably in the circumstances, could be

4   misled.").

5       For these reasons, Osmano's testimony does not

6   provide Plaintiffs with evidence of falsity required to

7   proceed on their claims.

8

9   **D. Express Warranty Claim**

10

11      To prevail on a breach of express warranty claim

12  under California law, a plaintiff must prove: (1) the

13  seller made an affirmation of fact or a promise, or

14  otherwise described the goods; (2) the statement formed

15  part of the basis of the bargain; (3) the express

16  warranty was breached; (4) the plaintiff was harmed;

17  and (5) the breach of warranty was a substantial factor

18  causing the plaintiffs harm.  Rosales v. FitFlop USA,

19  LLC, 882 F. Supp. 2d 1168, 1178 (S.D. Cal. 2012).  Like

20  with their claims under the UCL, FAL, and CLRA,

21  Plaintiffs' express warranty claim fails because they

22  have not produced any evidence to show that Defendants'

23  representations regarding the Products' benefits were

24  false.  Therefore, this claim must fail.  Cf. id.

25  ("Plaintiffs produced evidence purportedly establishing

26  that these claims are false, and thus have alleged

27  facts that support breach of these terms of the express

28  warranty.").

1

2       **E. Unjust Enrichment**

3

4           Defendants move to dismiss Plaintiffs' fifth claim

5   for unjust enrichment because it is not a cause of

6   action under California law.  (Mot. at 24-25.)  Several

7   decisions by the California Court of Appeals have held

8   that "[u]njust enrichment is not a cause of action,

9   just a restitution claim."  Hill v. Roll Intl. Corp.,

10  195 Cal. App. 4th 1295, 1307 (2011); accord Levine v.

11  Blue Shield of Cal., 189 Cal. App. 4th 1117, 1138

12  (2010); Durell, 183 Cal. App. 4th at 1370.  Other

13  federal courts have similarly determined that there is

14  no independent cause of action for unjust enrichment.

15  See, e.g., Brazil, 935 F. Supp. 2d at 967 (dismissing

16  with prejudice plaintiff's unjust enrichment claim

17  brought in connection with false labelling claims under

18  the UCL, FAL, and CLRA); Robinson v. HSBC Bank USA, 732

19  F. Supp. 2d 976, 987 (N.D. Cal. 2010).

20          In addition, restitution is already a remedy for a

21  UCL claim.  See Pfizer, 182 Cal. App. 4th at 631.

22  Therefore, any claim for restitution is superfluous.

23  The Court thus finds summary judgment is appropriate on

24  Plaintiffs' unjust enrichment claim.

25

26          In sum, Plaintiffs lack standing to proceed with

27  claims based on Defendants' website and the Products'

28  labels and fail to provide evidence of Defendants'

participation or control over bodybuilding.com
sufficient to confer vicarious liability over
statements on a third-party website.  Even if
Plaintiffs could overcome these barriers, they have not
met their burden of providing evidence that the
advertising claims on NitroPump and NOS Pump are false
or misleading.  Plaintiffs fail to present admissible
expert testimony or relevant scientific studies.  In
addition, the basis for all of their claims is a non-
cognizable lack of substantiation theory relying on
credibility attacks and inconclusive scientific studies
which fail to raise a triable fact regarding falsity.
Finally, Plaintiffs cannot rely on Osmano's testimony
to support a false or misleading claim because Osmano's
interpretation of Defendants' claims was unreasonable.
Plaintiffs' warranty and unjust enrichment claims flow
from the unsubstantiated UCL, CLRA, and FAL claims and
thus must similarly fail.

///
///
///
///
///
///
///
///
///

## V.   CONCLUSION

For the foregoing reasons, the Court GRANTS
Defendants' Motion for Summary Judgment and DENIES AS
MOOT Defendants' Motion to Deny Certification and
Plaintiffs' Motion for Class Certification.

Dated: November 18,2014

                    Jesus G. Bernal
                    United States District Judge